# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### PINE BLUFF DIVISION

CHARLES SIMMONS                                                                PLAINTIFF

v.                                    CASE NO. 5:14CV00081 BSM

CAMERON RHODES and
ROBBIE FREAD                                                                   DEFENDANTS

## <u>ORDER</u>

This is a prison abuse case brought by Charles Simmons, who alleges defendant Cameron Rhodes used excessive force against him while Simmons was a post-conviction detainee at the Arkansas County Detention Center.  He also alleges Rhodes and defendant Robbie Fread were deliberately indifferent to his medical needs.

The case was tried to the bench, beginning on June 15, 2016, and concluding on July 18.  Although testimony was taken on June 15, the trial was recessed so that Simmons's witnesses could be subpoenaed.  At the conclusion of the first day of testimony, judgment as a matter of law was entered for Rhodes and Fread on Simmons's deliberate indifference claim.  Accordingly, the only issue remaining was Simmons's excessive force claim against Rhodes.

The trial resumed, and was completed, on July 18.  Based on the testimony and the other evidence, including the videotape of the incident, judgment is entered for Rhodes because Simmons has not shown that the actions taken by Rhodes were "excessive and applied maliciously and sadistically for the purpose of causing harm."

## I.  THE TESTIMONY

A.      Charles Simmons

*1. Direct*

On February 13, 2004, Simmons was a post-conviction detainee in the Arkansas County Detention Center awaiting transfer to the Arkansas Department of Correction, and Rhodes was a guard. That morning, Simmons asked for a jail issued jumpsuit and Rhodes gave it to him. About five minutes after giving Simmons the jumpsuit, Rhodes returned to the barracks in which Simmons was housed and Simmons had his jumpsuit only partially on. Rhodes came into the barracks where Simmons was housed and told him to pack his belongings. When Simmons asked Rhodes why, Rhodes told Simmons that Simmons had three seconds to get his belongings or Rhodes was going to put Simmons on his head. Rhodes then grabbed Simmons and began trying to fight him.

At that point, another inmate named Mark, told Simmons to go to his cell and get his stuff. At this point, Simmons turned to walk to his cell, and when he did, Rhodes pushed Simmons in his back. When Simmons turned around to ask why Rhodes pushed him, Rhodes tased Simmons. The Taser was deployed so quickly that Simmons did not have an opportunity to ask the question he intended to ask. Simmons fell to the ground and was immobilized for more than five minutes. While immobilized, Simmons urinated on himself. When Simmons came through, he was placed in the hole.

When Simmons was taken to isolation, he asked to speak to defendant Fread, the jail administrator. Fread did not come to see Simmons and Simmons stayed in isolation for six

to seven days.

### 2. Cross

While examining the video of the incident, the following testimony was given. Simmons was not wearing a jumpsuit, while the other inmates were wearing a jumpsuit on the morning of February 13. The jail has a rule that inmates must wear jumpsuits at all times and Simmons had a jumpsuit in his cell. He was not wearing his jumpsuit because it was wet. That is why he asked for another one. No one ever asked Simmons to put on a jumpsuit.

At 19:15 of the video, Simmons is asking Rhodes why Rhodes wants Simmons to go to his cell and pack his belongings. Contact is made between the parties and Simmons does not know why. Rhodes, however, ordered Simmons to go to his cell and get his belongings but Simmons asked why and did not immediately go to his cell. At some point, Rhodes grabbed Simmons's arm and Simmons turned around and told Rhodes to keep his hands off of Simmons. At that point Rhodes pushed Simmons.

After the tasing, Simmons did not receive medical attention relating to the tasing. When Simmons was taken to the holding cell, Rhodes snatched the Taser's barbs out of Simmons. On March 5, however, Simmons was seen by Ralph Maxwell, DO, for his high blood pressure. At that visit, Simmons told Dr. Maxwell that he had been tased.

### 3. Redirect on July 18

The video shows that Simmons was not a threat to Rhodes at any time. All Simmons

wanted to know was why he was being taken to the hole, and although Simmons probably did give the jail staff a hard time, Simmons did not understand why he was being taken to the hole because, by the time he was told he was going to the hole, he was in compliance with the guard's orders.  Also, Simmons did not understand why Rhodes pushed him in the back and that is why he turned around to ask, but before he could ask the question, Rhodes tased Simmons.

### 4. Recross

Simmons knew he was supposed to wear a jumpsuit.  Rhodes twice told Simmons to get his belongings.  On both occasions, Simmons did not immediately go and get his belongings, but asked Rhodes why.  Rhodes told Simmons he was going to put Simmons on his head.  Rhodes attempted to take Simmons by the arm and lead Simmons.  Simmons never threatened Rhodes and never balled his fists.

### B.    Kirk Johnson

### 1. Direct

Johnson was employed by the Arkansas County Sheriff's Department on the day in question.  He was on duty that day but did not see the incident.  He knew immediately about Simmons being tased but did not see it.  Johnson did not stop what he was doing to see if Simmons was okay.

### 2. Cross

Johnson came into contact with Simmons on February 13, as Rhodes was taking

Simmons to isolation.  Johnson could hear Simmons hollering at Rhodes when Rhodes was moving Simmons to isolation.  He could hear Simmons "down the hall."  Simmons was saying "[w]hat was you moving me for" and "[w]hat did I do[?]"

The jail's policy is that inmates have to wear jumpsuits while they are in the day room. When this rule is not enforced for one inmate, "it becomes a problem" with the other inmates.  Therefore, it is not unusual for an inmate to be placed in isolation if he does not follow the rule.  Further, inmates normally go to lock down after they are tased because tasing usually occurs because an inmate is not following orders.  Tasing is not used for discipline.  It is used to maintain order in the jail.

### 3. Responses to the Court's Questions

Jail guards are not required to beg inmates to follow directives.  At some point, the inmates have to follow the guard's directives.  The Taser is not deadly force; a guard is permitted to use it when the guard gives an instruction and the inmate responds by trying to fight back, or walks into the guard's space.  A guard is also permitted to use the Taser when the guard is attempting to move an inmate and the inmate jerks away from the guard or throws his arm because the guard does not know what action the inmate is about to take.

### C.   Peggy Pitts

### 1. Direct

Pitts is a lieutenant at the Arkansas County Detention Center.  She was on duty on the day in question but does not know anything about the incident.

*2. Cross*

Pitts has been employed at the jail for eighteen years.  She is familiar with Simmons. The jail has a rule that inmates who are in the pod area must have on jumpsuits.  This was the rule on February 13.  Normally, when an inmate is in the pod without a jumpsuit on, the inmate is given three warnings to put a jumpsuit on.  If the inmate fails to comply, he will be taken from the pod and put in the holding tank for a couple of hours to let the inmate calm down.  Normally, the inmate will calm down and then will be taken back to the pod.  It is important for the inmates to wear the orange jumpsuit because it readily distinguishes the inmates from the guards.  This is necessary to maintain order in the jail and is for the safety of the officers and inmates.

*3. Redirect*

The rule regarding the wearing of jumpsuits is posted on the pod door.

*4. Responses to the Court's Questions*

Simmons did not give Pitts many problems.  Pitts supervised Rhodes and was not aware of any pre-existing conflicts between Simmons and Rhodes.  Nothing about the relationship between Rhodes and Simmons would lead Pitts to believe that Rhodes had animosity towards Simmons.  Nothing about Simmons's history in the jail would lead the jailers to have the view that they should take action against him immediately if he gets out of line.

D.    Tabetha Inman

Inman has been a jailer at the Arkansas County Detention Center for seven years. She is also a control room operator. Although she was on duty on February 13, she has no recollection of the incident at issue. She grew up with Simmons and attended school with him. She was left in charge of the jail on the day in question because Pitts had left the jail.

Inman does not know whether there was animosity between Simmons and Rhodes. Simmons was an easy inmate for her to deal with. He, however, was not so easy for the other guards to deal with. If Inman or Pitts asked Simmons to do something, he would always do it without causing any problems. Because she worked in the control room, she would hear issues between Simmons and other guards, unless she blocked it out. Simmons had conflicts with other guards for failing to put on his jumpsuit.

E.    Cameron Rhodes

Rhodes was a guard at the Arkansas County Detention Center from October 2012 until October 2015. He left to join the U.S. Marine Corps. He now serves in the Marines while working at Ed's Supply. Rhodes did not use excessive force against Simmons.

The events occurred at six o'clock in the morning. Simmons was inside the pod with the other inmates and Rhodes was in the control room outside the pod but could see in. Rhodes pushed the intercom button and told Simmons to get a jumpsuit and that Simmons's visitation rights were being taken because Simmons had been warned previous times. He also told Simmons "you're coming up to the front for not having a jumpsuit on." At that point, Simmons did not tell Rhodes that he did not have a jumpsuit. When an inmate is going

to be locked down, it creates a lot of problems with the other inmates.  This is the case because the other inmates "mess with" or "terroriz[e]" the inmate being locked down.  To prevent this, the inmate being locked down is brought "up front" out of the pod.  Simmons told Rhodes that he did not have a jumpsuit, although Rhodes learned later that Simmons had one folded jumpsuit lying on the bed in his cell.

Rhodes was continuing to perform other duties but was told to take Simmons a jumpsuit and he did so.  After giving Simmons the jumpsuit, Rhodes continued performing his other responsibilities.  He, however, assumed that Simmons put the jumpsuit on.  At some point later, Rhodes could see through the glass that Simmons had put on the jumpsuit partially.  Rhodes gestured to Simmons to put on the jumpsuit fully and then walked down the hallway.  A little more than four minutes later, Rhodes came back to the pod area, face to face with Simmons.  Any communication between the two prior to this moment had been via intercom.

Rhodes told Simmons to go to his cell and pack his belongings.  In response, Simmons said: "what the fuck for?  I ain't done shit."  Rhodes informed Simmons that he had told Simmons multiple times to put his jumpsuit on, and Simmons told Rhodes, "I ain't going no fucking where with you."  Rhodes then told Simmons to get to stepping and go "pack your shit, Charles Simmons, you're going to the front."  Simmons got louder and hostile with Rhodes.  Rhodes approached Simmons to grab Simmons and lead him to his cell.  At this point, Simmons told Rhodes, "I ain't going no fucking where with you.  If you touch me, I'll

crack you in your head." During this confrontation, Simmons denied Rhodes's instructions at least five times.

Rhodes then tried to put his right hand on Simmons's right hand, but Simmons pulled away. Because Simmons is larger than Rhodes, Rhodes tried to grab Simmons with both hands while asking him to comply, but Simmons said "I'm not going nowhere..." and shrugged away, and then balled his fist up and said "I'm going to crack you on your head if you touch me again." Rhodes then tased Simmons. During the entire confrontation, Rhodes told Simmons to go to his cell approximately nine or ten times and at no time did Rhodes comply.

At the time Rhodes tased Simmons, Rhodes thought Simmons was going to hit him. Rhodes believed that his only option was to tase Simmons because it was the only way Rhodes was going to be able to move Simmons. Simmons and Rhodes had no history of anger or animosity and Rhodes harbored no grudges against Simmons. The parties had never fought, although Simmons and Rhodes had engaged on prior occasions regarding Simmons's failure to wear his jumpsuit.

After tasing Simmons, Rhodes asked Simmons if he needed medical attention and Simmons said no. As soon as Simmons was on his feet and walking to the holding tank, however, Simmons started threatening Rhodes.

### 2. Cross

When asked whether the video shows that Rhodes did not try to grab Simmons's shirt,

but tried to grab Simmons's throat, Rhodes responded "no."  When asked whether the video shows Rhodes pushing Simmons in the back, Rhodes responded that he did not push Simmons in the back.  Rhodes attempted to grab Simmons's shoulder but Simmons jerked his arm away from Rhodes.  When asked whether Rhodes remembered a prior incident between the parties in which Rhodes threw his taser onto the table and said he did not need it, and invited Simmons to fight him in the day room, Rhodes said he did not.

## II.  DISCUSSION

When the evidence is weighed, it seems pretty clear that Simmons has a very difficult time following rules.  Given the witnesses' testimony, he was routinely out of his jumpsuit although he was aware the rules of the county jail required him to wear his jumpsuit when he was out of his cell and in the common areas.  It is without question that Simmons was aware of this rule, not only because, as he testified, he has spent a lot of time in the county jail, but also because the rules are clearly posted on the wall.  Despite this, he has had many run-ins with jail officials because he refused to wear his jumpsuit.

Further, it is clear Rhodes was simply performing his job when he told Simmons to put on his jumpsuit.  It is also clear Rhodes was simply doing his job when he brought Simmons a jumpsuit to put on.  Finally, it is clearer than day that Rhodes acted appropriately when he attempted to remove Simmons from the pod because Simmons had violated jail policy.

The question is whether Rhodes used excessive force when he tased Simmons.  Given

the evidence, the answer to that question is no.  This is true because Simmons was a post-conviction detainee.  Therefore, he must prove by a preponderance of the evidence that: (1) he was tased; (2) the tasing was excessive and applied maliciously and sadistically for the purpose of causing harm; (3) he was injured as a direct result of the tasing; and (4) Rhodes acted under color of law.  Although it is undisputed that Rhodes was tased and that Rhodes was acting under color of law when Rhodes tased Simmons, the second element has not been met and the third element is met but needs a little more analysis.

Simmons has met his burden on the third element because the record supports that he suffered pain as a result of being tased.  Although the Eighth Circuit's jury instruction states that Simmons must prove that he was injured as a direct result of the tasing, "'pain, not injury,' is the touchstone of an Eighth Amendment claim." *Hendrickson v. Cooper*, 589 F.3d 887, 995 (7th Cir. 2009).  This is important because it is fairly easy to conclude that Simmons suffered pain as a result of being tased; however, in that this fact-finder does not consider "pain" and "injury" to be synonymous terms, it would be a little more difficult to find, based on the trial testimony, that Simmons suffered an injury as a result of being tased.

Although Simmons has met his burden on elements one, three, and four, he has not met his burden on the second element because he has not shown that Rhodes's use of the Taser was excessive given the circumstances.  This is true because Simmons was repeatedly told to go to his cell and grab his belongings but refused to do so.  When Rhodes attempted to escort Simmons, Simmons jerked away.  At this point, Rhodes was faced with a couple

of choices, either stand down and permit the inmate to control the jail, or tase Simmons and bring this altercation to a swift conclusion, thereby retaining order in the jail. *See Johnson v. Hamilton*, 452 F.3d 967, 972 (8th Cir. 2006) (prison officers are allowed to "use force reasonably in a good-faith effort to maintain or restore discipline, as long as they do not use force maliciously and sadistically to cause harm."). Tasing Simmons to bring the altercation to a swift conclusion was not excessive.

Even if Rhodes used more force than was necessary (which, as set forth in the previous paragraph, the evidence does not support), the evidence does not show that Rhodes applied the force for malicious and sadistic purposes. *See, e.g.*, *United States v. Miller*, 477 F.3d 644, 647 (8th Cir. 2007) (an officer acts maliciously by undertaking, without just cause or reason, a course of action intended to injure another and acts sadistically by engaging in extreme or excessive cruelty or by delighting in cruelty). The evidence simply does not support a conclusion that Rhodes acted sadistically. Moreover, the preponderance of the evidence shows that Rhodes did not act maliciously.

The key evidence on this point is the dispute between Rhodes and Simmons as to whether Rhodes pushed Simmons in the back or whether Simmons jerked away from Rhodes when Simmons tried to grab Rhodes. This is key because, it appears that at some point, Simmons turned away from Rhodes. Once Simmons turned away, either he was pushed in the back by Rhodes or he jerked away from Rhodes when Rhodes tried to grab him. If Simmons was pushed in the back by Rhodes, Simmons could assert Rhodes pushed him in

an attempt to bait him into an altercation so that Rhodes could tase Simmons.  If this were true, it would be one piece of evidence indicating Rhodes acted maliciously.  Although the video is inconclusive, it appears Simmons was not pushed in the back, but jerked away from Rhodes.  This conclusion is supported by the testimony of the witnesses and the fact-finder's observation of Simmons and Rhodes in court.  Simmons is much more strongly built than Rhodes.  In fact, viewing the two men in court, it appears Simmons outweighs Rhodes by more than thirty pounds.  Consequently, the motion made by Simmons when Rhodes's hand touched Simmons's back is more in keeping with Rhodes's testimony than Simmons's testimony.

### III.  CONCLUSION

For the reasons stated herein, judgment is granted for defendant Cameron Rhodes and the claims of plaintiff Charles Simmons are dismissed with prejudice.

ENTERED on this 28th day of July 2016.

_____
UNITED STATES DISTRICT JUDGE